NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MECCA & SONS TRUCKING CORP.<br><br>                                Plaintiff,<br><br>      v.<br><br>WHITE ARROW, LLC, TRADER JOE'S COMPANY, INC., ABC CORPORATIONS 1-5, and JOHN DOES 6-10.<br><br>                                Defendants. | Civil Action No. 14-7915 (SRC)<br><br>OPINION |

**CHESLER**, District Judge

This matter comes before the Court on the motions for summary judgment filed by Mecca & Sons Trucking Corp. ("Mecca") [Docket No. 40], White Arrow, LLC ("White Arrow") [Docket No. 39], and Trader Joe's Company, Inc. ("Trader Joe's") [Docket No. 41], pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court will grant the motion for summary judgment of Trader Joe's. The Court will grant in part and deny in part the motions for summary judgment of Mecca and White Arrow.

**I.    BACKGROUND**

This case concerns the transportation of a shipment of cheese. The following facts are not in dispute. Trader Joe's purchased approximately $81,000 worth of cheese from Singleton Dairy, LLC. Trader Joe's requires shipment at or below 40 degrees Fahrenheit and has the right, pursuant to the Master Vendor Agreement, to reject the shipment if temperatures during transit or upon receipt exceed that threshold. (McIntyre Cert. Ex. A, at p. 14 ¶ 6, p. 4 ¶ 8(b).) Singleton hired

1

Mecca to deliver the cheese from Bayonne, New Jersey to Fontana, California. Mecca subcontracted the job to White Arrow. White Arrow quoted Mecca a rate for shipping pallets "chilled 40 degrees[.]" (Mecca SOF ¶ 7.)

The shipment was in transit between June 18, 2014, and June 24, 2014. Two devices – TempTale, provided by Singleton, and White Arrow's Thermo King WinTrac 4 – recorded the temperatures during shipment. The Thermo King set the temperature inside the trailer; the TempTale devices were placed on the pallets. The temperature of the refrigerated trailer was set to 40 degrees. (Trader Joe's SOF ¶ 31.) However, both units logged higher actual temperatures. The Thermo King registered 957 out 1,702 readings above 40 degrees. (Id. ¶ 33.) Almost all the measures from the TempTale units were over 40 degrees, with spikes reaching over 60 degrees. (*Id.* ¶¶ 36, 38, 40; Mecca SOF ¶ 12.) Because of the warm temperature readings from the TempTale, Trader Joe's refused eleven of the seventeen pallets of cheese. (Mecca SOF ¶ 14.)

The rejected cheese was moved to US Growers Cold Storage Warehouse. There, seven weeks later, Brian Mitchell, an expert retained by White Arrow, inspected the product and concluded that it was not damaged by the heat. Mitchell reported that the cartons were in good condition with no evidence of moisture due to high temperatures, no condensation on the plastic packaging, no loosening of the vacuum bag, which would have indicated bacterial growth, and no evidence of new mold growth. (Gutterman Decl., Ex. F.) In all, Mitchell saw no signs of problems and opined that the shipment should not have been rejected.

Mecca filed a Complaint against White Arrow in the Superior Court of New Jersey, Hudson County. White Arrow removed the case to Federal Court. Mecca amended its Complaint to add Trader Joe's as a Defendant. The operative Second Amended Complaint asserts claims sounding in negligence, breach of contract, and indemnification against White Arrow, and a claim for

wrongful rejection against Trader Joe's. White Arrow filed a cross-claim against Trader Joe's for wrongful rejection. Trader Joe's filed a cross-claim for indemnification against White Arrow. Mecca subsequently determined that Trader Joe's acted properly and has twice attempted to dismiss the company as a Defendant but was unsuccessful over White Arrow's objections. The case is before the Court upon the parties' motions for summary judgment.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable

3

to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  It may not make credibility determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir.2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B. Trader Joe's Motion for Summary Judgment

Trader Joe's moves for summary judgment on Mecca's claim and White Arrow's cross-claim arising out of the alleged wrongful rejection.  Mecca does not oppose the motion.  The obligations of Trader Joe's with respect to the cheese shipment are governed by the Master Vendor Agreement.  The agreement provides that "[a]ll refrigerated products shall be shipped and received at 40°F or less" and allows Trader Joe's to "return . . . any goods that are in violation of any of the terms" of the Agreement.  (McIntyre Cert. Ex. A, at p. 14 ¶ 6, p. 4 ¶ 8(b).)  Temperature readings, as measured by both the TempTale and Themro King devices, exceeded 40 degrees.  Because the

higher temperatures violated the terms of the Agreement, Trader Joe's had the right to reject the shipment. With this, both the seller and Plaintiff Mecca agree. (*See* Dep. of Michael Mecca, vice president of Mecca's operations, at 53:18-22 ("it is up to . . . Trader Joe's[ ] to determine if they will accept the cargo or not and that acceptance is based on their criteria . . . to maintain temperatures at 40 degrees."); Aff. of Kevin Pedersen, operations manager of Singleton Dairy, LLC, ¶ 12 ("[b]ased upon the Master Vendor Agreement and my review of the TempTale data for the subject cheese over the six day period in which it was shipped and received, Trader Joe's rightfully rejected the shipment.")).

White Arrow has no basis for a claim against Trader Joe's. White Arrow had no contractual relationship with Trader Joe's and was not a third-party beneficiary of the contract with Singleton. White Arrow's argument that its claim derives from the bills of lading that were the contracts of carriage is unavailing. The Master Vendor Agreement between Trader Joe's and Singleton controls the circumstances pursuant to which Trader Joe's may reject the cheese. Under the terms of this agreement, Trader Joe's acted properly. Accordingly, the Court will grant the motion for summary judgment of Trader Joe's and enter judgment in favor of Trader Joe's on all claims and cross-claims.

### C. Mecca's and White Arrow's Motions for Summary Judgment

Mecca moves for summary judgment on its Carmack Amendment claim against White Arrow.[1] White Arrow's motion for summary judgment asks the Court to dismiss the Second Amended Complaint against White Arrow. The broker/carrier agreement between Mecca and

---

[1] The Second Amended Complaint alleges claims against White Arrow sounding in negligence, breach of contract, and indemnification. Liability under the contract is governed by the Carmack Amendment, which provides the "exclusive cause of action for interstate-shipping contract [and tort] claims alleging loss or damage to property." *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 336 (3d Cir. 2014) (quoting *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 688-90 (9th Cir. 2007)). Accordingly, the Court interprets Mecca's breach of contract claim as a cause of action under the Carmack Amendment. Mecca's motion for summary judgment is "predicated upon . . . the Carmack Amendment[.]" (Pl.'s br. at 4.)

5

White Arrow provides that "the Carrier's liability for cargo loss or damage shall be governed by the provisions of [the Carmack Amendment] 49 U.S.C. § 14706." (Gutterman Decl., Ex. H.) "The Carmack Amendment governs the liability of common carriers on bills of lading." *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003). It allows recovery of damages from a carrier for "actual loss or injury to the property" resulting from the transportation of cargo in interstate commerce. 49 U.S.C. § 14706(a)(1). The Carmack Amendment provides the "exclusive cause of action for interstate-shipping contract [and tort] claims alleging loss or damage to property." *Lloyds of London*, 762 F.3d at 336 (quoting *Hall*, 476 F.3d at 688-90).

To establish a prima facie case against a carrier, a person must prove "(1) delivery of goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) amount of damages." *Beta Spawn, Inc. v. FFE Trans. Serv., Inc.*, 250 F.3d 218, 223 (3d Cir. 2001) (quoting *Conair Corp. v. Old Dominion Freight Line, Inc.*, 22 F.3d 529, 531 (3rd Cir. 1994)). The burden then shifts to the carrier to prove it was not negligent and the damage was caused entirely by "(a) [an] act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Id.* at 226 (quoting *Missouri Pacific R.R Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964)).

The initial condition of the cheese is not in dispute. Rather, White Arrow contends that Mecca failed to prove that the cheese was damaged in transit. White Arrow focuses on the absence of signs of observable harm, relying on the report of Brian Mitchell,[2] who performed a visual inspection of the packaging of the rejected product and concluded that it revealed no evidence of temperature abuse to compromise the shipment. (Mitchell Aff. ¶¶ 4, 7.) White Arrow indicates that even at temperatures of 62 to 63 degrees, it would take four or five days for the cheeses in

---

[2] White Arrow seeks to qualify Mitchell as an expert. The Court does not need to evaluate his qualifications because even if the Court were to accept his findings, it concludes that Trader Joe's rightfully rejected the cheese.

question to turn rancid. Mitchell faulted Trader Joe's for failing to measure the pulp temperatures of the cheese, drawing a distinction between the temperature of the ambient air, which was recorded by the TempTale, (the accuracy of which White Arrow also questions), and the temperature of the product itself. (*See Id.*)[3] Mecca counters that prolonged exposure to temperatures above 40 degrees is sufficient to constitute damage under the Carmack Amendment to a perishable product requiring refrigeration.

White Arrow's restrictive understanding of damage fails to appreciate the gravity of the duty for a retailer like Trader Joe's to assure the safety of food that it sells to consumers. The Court finds *Oshkosh Storage Co. v. Kraze Trucking LLC* persuasive. 65 F. Supp. 3d 634 (E.D. Wis. 2014). There, a customer rejected a shipment of kosher cheese because the carrier's driver prematurely broke a trailer seal before delivery. In a similar vein to White Arrow, the carrier argued that it is unreasonable to reject a perfectly good shipment simply because of a broken seal. *Id.* at 637. The court disagreed, emphasizing that "[f]ood distributors have a duty to ensure that the food they provide to the public is safe, and the requirement that shipments be unsealed only by authorized personnel is intended to provide assurance that the shipment has not been contaminated." *Id.* at 638. "Given the risk to customers and a distributor's own potential liability, it is not unreasonable for a company to adopt a policy of rejecting shipments of food products when the seal has been broken as long as that policy has been clearly announced." *Id.*

Like a seal, a temperature threshold is a reasonable safeguard to assure food integrity, prolong shelf life, minimize deterioration, and protect Trader Joe's and its customers. The product does not have to turn rancid or grow mold to warrant concern. The TempTale recorded

---

[3] White Arrow cites *Roadway Exp., Inc. v. Fuente Cigar, Ltd.*, 749 F. Supp. 248 (S.D. Fla. 1990), for the proposition that a consignee who fails to inspect goods at arrival cannot establish the condition of the delivered shipment. The Eleventh Circuit vacated the district court's entry of judgment for the carrier, holding that damage can be shown by "substantial and reliable circumstantial evidence alone." 961 F.2d 1558, 1561 (11th Cir. 1992).

temperature in the trailer in 10 minute intervals over the course of the shipment's six-day journey from New Jersey to California. Out of 2,679 readings, 2,673 exceeded 40 degrees, with spikes reaching into the sixty and seventy-degree range. Questioning the accuracy of the TempTale does not help WhiteArrow, as 957 out of 1,702 temperature measures taken by its own Thermo King device were above the set point. White Arrow was aware of the temperature requirement. It quoted Mecca a rate for a shipment "chilled 40 degrees" and set the temperature to that level. (Mecca SOF ¶ 7; Trader Joe's SOF ¶ 31.) The temperature did not remain at that point while the cheese was in transit.[4]

     White Arrow fails to establish that it was not negligent. First, Mitchell states that the high temperatures recorded on June 18 and June 24 were "most likely" caused by the doors to the trailer being open during loading and unloading. (Mitchell Aff. ¶ 7.) Even if that explanation is correct and acceptable, which is far from clear, the elevated temperatures were not limited to those periods and occurred at various times during transit. White Arrow also cites the testimony of its driver, Daniel Flores, who transported the load during the last leg of the trip from a railyard in Los Angeles to the destination in Fontana, stating that he had no recollection of any temperature problems. (White Arrow SOF ¶ 23.) This testimony does not bring into question the recorded temperatures and White Arrow does not dispute that the Thermo King registered 957 out 1,702 readings above 40 degrees. (Trader Joe's SOF ¶ 33.) Consequently, the evidence presented by White Arrow is not sufficient to challenge the reasonableness of the purchaser's apprehension about the temperature fluctuations or absolve White Arrow from responsibility.

---

[4] White Arrow states that it was not required to maintain the cheese itself at 40 degrees. This is an empty distinction. The fact that temperatures registered inside the trailer exceeded 40 degrees is sufficient to establish liability because the shipping temperature, like a seal, is a reasonable precaution to assure food safety. White Arrow also appears to state that it complied with requirements by setting the temperature to 40 degrees, as it had no obligations to maintain that temperature. This is not a colorable argument. A setting of 40 degrees is meaningless if that is not in fact the temperature at which the product is shipped.

Accordingly, the Court will grant partial summary judgment on Mecca's claim under the Carmack Amendment, on the issue of liability only, as Mecca has not submitted evidence of damages, including evidence about any resale and/or salvage value of the rejected product. The Court will grant White Arrow's motion for summary judgment as to the preempted claims sounding in negligence and indemnification. The Court will otherwise deny White Arrow's motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, the Court will **GRANT** the motion for summary judgment of Trader Joe's. The Court will **GRANT** in part and **DENY** in part the motions for summary judgment of Mecca and White Arrow. An appropriate Order will be filed.

          s/ Stanley R. Chesler
          STANLEY R. CHESLER
          United States District Judge

Dated: September 16th, 2016